**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **AMY F. HINTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CASE NUMBER:** |
| **vs.** | ) | **2:18-CV-00994-RAH-JTA** |
| | ) | |
| | ) | |
| **ALABAMA STATE UNIVERSITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW, Plaintiff Amy F. Hinton ("Hinton" or "Plaintiff"), and requests this Court deny Defendant Alabama State University's ("ASU" or "Defendant") Motion for Summary Judgment (Doc. 43 and 44). In support thereof, Plaintiff states the following:

## PLAINTIFF'S FACTS

In or about July 2015, Plaintiff, Amy Hinton, (hereinafter, "Hinton" or "Plaintiff") was contracted by Alabama State University ("ASU") to work with the Health Information Management ("HIM") Department of the College of Health Sciences as a contract employee assisting the HIM Department Chair, Dr. Cheryl Plettenberg, and the HIM Department in the accreditation process with CAHIM.  (Pl. Evid. Ex. 3, Hinton Aff. ¶ 2). Hinton was recommended for this contract work by the Dean of the College of Health Sciences, Dr. Steven Chesbro.  (Pl. Evid. Ex. 3, Hinton Aff. ¶ 2).  Dr. Chesbro is a white male and Dr. Plettenberg was a white female. (Pl. Evid. Ex. 3, Hinton Aff. ¶ 3; Pl. Evid. Ex. 18, Simmons Aff. ¶ 4, 5).

In August 2015, Hinton was hired as an Adjunct Professor by ASU to teach a course (HIM 210) for Fall 2015 Semester in the HIM Department of the College of Health Sciences. (Pl. Evid. Ex. 3, Hinton Aff. ¶ 4; Pl. Evid. Ex. 4, p. 1). Hinton was recommended for hiring as an Adjunct Professor by Dean Chesbro and Dr. Plettenberg.  (Pl. Evid. Ex. 3, Hinton Aff. ¶ 4; Pl. Evid. Ex. 4, p. 2).

On or about October 13, 2015, Hinton submitted an application for the full-time job position of Health Information Management Instructor, Assistant, Associate Professor to ASU. (Pl. Evid. Ex. 3, Hinton Aff. ¶ 5, exh. A).  During the Fall Semester of 2015, Hinton was interviewed for this position, and she was then recommended for hiring as an Assistant Professor in HIM by Dr. Chesbro and Dr. Plettenberg.  (Pl. Evid. Ex. 3, Hinton Aff. ¶ 5; Pl. Evid. Ex. 5; Pl. Evid. Ex. 18, Simmons Aff. ¶ 3). Hinton was hired by ASU as a full-time, probationary Assistant Professor in the Spring Semester of 2016, which started in January 2016.  (Pl. Evid. Ex. 3, Hinton Aff. ¶ 5; Pl. Evid Ex. 6; Pl. Evid. Ex. 18, Simmons Aff. ¶ 3).  This position of Assistant Professor was a tenure track job position.  (Pl. Evid. Ex. 3, Hinton Aff. ¶ 5).

When Hinton began working as an Assistant Professor, there were five employees in the HIM Department.  (Pl. Evid. Ex. 18, Simmons Aff. ¶ 4).  There were three Professors, the Department Chair and the Department secretary.  (Pl. Evid. Ex. 18, Simmons Aff. ¶ 4).  The three Professors were Sabine Simmons, Bridgettte Stasher-Booker, and Amy Hinton, and the secretary was Mae Tullis.  (Pl. Evid. Ex. 18, Simmons Aff. ¶ 4).  The racial make-up of the HIM Department was the following:

Cheryl Plettenberg – Caucasian

Sabine Simmons – Black

       Bridgette Stasher-Booker – Black

       Amy Hinton – Caucasian

       Mae Tullis – Black

(Pl. Evid. Ex. 18, Simmons Aff. ¶ 4).

When Hinton first began her contract work for the HIM Department, Brenda Dawson was Dr. Chesbro's clerical assistant. (Pl. Evid. Ex. 18, Simmons Aff. ¶ 5). Ms. Dawson is a black female. (Pl. Evid. Ex. 18, Simmons Aff. ¶ 5). In addition, Dr. Leon Wilson was the Provost and Vice President for Academic Affairs for ASU and he is a black male. (Pl. Evid. Ex. 3, Hinton Aff. ¶ 8).

Dr. Sabine Simmons was employed by ASU in the HIM Department from on or about September 2008 until on or about September 2017. (Pl. Evid. Ex. 18, Simmons Aff. ¶ 2). Dr. Simmons was initially hired as an Instructor/Academic Coordinator of Clinical Education on a Temporary full-time basis. (Pl. Evid. Ex. 18, Simmons Aff. ¶ 2). In May 2014, Dr. Simmons was promoted to the rank of Assistant Professor, effective at the beginning of Fall 2014 semester, and her job position became Assistant Professor/Academic Coordinator of Clinical Education. (Pl. Evid. Ex. 18, Simmons Aff. ¶ 2). Dr. Simmons remained in this position until her employment with ASU ended in or about September 2017. (Pl. Evid. Ex. 18, Simmons Aff. ¶ 2).

Bridgette Stasher-Booker was hired as full-time Assistant Professor in HIM on January 5, 2015. (Pl. Evid. Ex. 16). Stasher-Booker did not have any prior academic teaching experience when she was hired. (Pl. Evid. Ex. 34 p.2-3; Pl. Evid. Ex. 35 &36).

In late December 2015, Dr. Chesbro's employment with ASU ended.  (Pl. Evid. Ex. 3, Hinton Aff. ¶ 6).  On July 1, 2016, Dean Chesbro was replaced as the Dean of the College of Health Sciences by a black female, Cheryl Easley.  (Pl. Evid. Ex. 18, Simmons Aff. ¶ 12; Pl. Evid. Ex. 20, Easley Depo. 20:7-12, 38:18-39:2, exh. 15, pp. 7, 12).  Brenda Dawson remained as the administrative assistant to Dean Easley.  (Pl. Evid. Ex. 18, Simmons Aff. ¶ 12; Pl. Evid. Ex. 20, Easley Depo. 17:19-20, 19:2-15).

Hinton was assigned the classes that she taught for Spring 2016 Semester in HIM Department by Dr. Plettenberg. (Pl. Evid. Ex. 3, Hinton Aff. ¶ 7).  From January 11, 2016 until January 31, 2016, Hinton worked and taught classes prior to ASU issuing her contract of employment, and she was notified that she would be paid for the days she worked and that her full-time employment would begin on February 1, 2016.  (Pl. Evid. Ex. 3, Hinton Aff. ¶ 7, exh B).  ASU gave Hinton a Notice of Employment with the effective date of February 1, 2016 for her full-time hire date.  (Pl. Evid. Ex. 6).

During Hinton's employment with ASU, black employees made racially discriminatory comments about her and treated her in a discriminatory manner.  (Pl. Evid. Ex. 18, Simmons Aff. ¶ 6).  Dr. Simmons witnessed Ms. Tullis and Brenda Dawson treat Hinton in a discriminatory and disrespectful manner due to her race.  (Pl. Evid. Ex. 18, Simmons Aff. ¶ 6, 7).  Ms. Tullis and Ms. Dawson were very friendly with each other at work and both treated Hinton in a discriminatory manner.  (Pl. Evid. Ex. 10, Hinton Depo. 99:2-100:15; Pl. Evid. Ex. 18, Simmons Aff. ¶ 6).  Ms. Tullis informed Dr. Simmons that she was not fond of Hinton because she was different "from us", meaning that Hinton was white.  (Pl. Evid. Ex. 18, Simmons Aff. ¶ 6).  Ms.

Tullis also informed Dr. Simmons that Hinton "didn't belong" at ASU.  (Pl. Evid. Ex. 18, Simmons Aff. ¶ 6).

During Hinton's employment, Dr. Simmons heard Brenda Dawson say that there were "too many white employees" in the College of Health Sciences, or words to this effect.  (Pl. Evid. Ex. 18, Simmons Aff. ¶ 7).

Dr. Simmons also heard black employees and students refer to the College of Health Sciences in a racially derogatory manner as the "White House".  (Pl. Evid. Ex. 18, Simmons Aff. ¶ 8).  It was common knowledge around campus that the College of Health Sciences was referred to in a racially derogatory manner as the "White House".  (Pl. Evid. Ex. 18, Simmons Aff. ¶ 8; Pl. Evid. Ex. 22, Wilson Depo. 92:1-93:3; Pl. Evid. Ex. 20, Easley Depo. 100:1-15). Bridgette Stasher-Booker would go into Dr. Simmon's office and talk negatively about Hinton. (Pl. Evid. Ex. 18, Simmons Aff. ¶ 9).  Bridgette Stasher-Booker stated to Dr. Simmons that "I just can't stand that white bitch" when she was talking negatively about Hinton.  (Pl. Evid. Ex. 18, Simmons Aff. ¶ 9).  When Dr. Simmons refused to participate in the discriminatory treatment of Hinton by Stasher-Booker, Tullis and Dawson, they began to retaliate against her and treat her differently.  (Pl. Evid. Ex. 18, Simmons Aff. ¶ 10).

From the time Hinton became faculty, Dawson refused to give her faculty business cards and grant her proper access to the building with a digital keycard. (Ex. 10, Hinton Dep., 84:5-86:14). This was not the case for any of HIM's African American faculty. (*Id.* 84:5-23). Dawson would often call Dr. Plettenberg, Hinton's supervisor, to yell complaints about aspects of her work and request that Hinton be fired. (*Id.* at 66:3-70:15). On one occasion Dawson refused to treat Hinton as a full-time faculty member, denying her a faculty questionnaire in a staff meeting

and stating to Hinton's coworkers that she was not in fact full-time. (*Id.* at 88:13-89:23; Pl. Evid. Ex. 19, Dawson Depo.105:1-108:13). Provost Wilson, acting Dean and Dawson's supervisor, stated that she "ran the place" and spoke inappropriately in the office. (Pl. Evid. Ex. 22, Wilson Depo.54:15-55:8, 59:8-22).

Mae Tullis, office assistant for HIM department also treated Hinton differently (Pl. Evid. Ex. 10, Hinton Depo. 99:2-104:13). In Spring 2015, Tullis failed to schedule lodging for Hinton to a faculty retreat in New Orleans. (Pl. Evid. Ex. 10, Hinton Depo. 99:2-104:13). Hinton was not reimbursed for this trip until a year and a half later, when she left ASU. (*Id* at 104:14-19). Tullis also tried to delay payment of Hinton's final paycheck until the month after Hinton's departure from ASU. (*Id.*at 108:12-110:10.111:9-21,112:8-16). Finally, in Fall 2016, Tullis twice scheduled HIM faculty meetings during the times that Hinton was slated to teach Criminal Justice courses. (*Id.* at 106:1-107:1).

Plaintiff was subject to disparaging comments about her race, Caucasian by her black co-workers and the students, including referring to the HIM and the college as the "white house". (Pl. Evid. Ex. 1, p.6¶2; Pl. Evid. Ex. 10, Hinton Depo., exh 5 Interrogatory Response Number 6). These co-workers made the false and disparaging statements to other ASU employees in an attempt to bully and disparage Plaintiff's professional reputation, which included Booker calling her a "white bitch" and saying that she was unqualified. (Pl. Evid. Ex. 10, Hinton Depo.77:9-79:19, 83:6-84:4).

Hinton complained multiple times to Dr. Plettenberg about this discriminatory treatment by Tullis and Dawson. (Pl. Evid. Ex. 10, Hinton Depo. 99:5-100:15, and Depo. exh5, Response Number 8). She went to Dr. Plettenberg as early as 2015 to discuss Dawson's disparaging

comments. (Pl. Evid. Ex. 10, Hinton Depo. 146:13-146:6.) Plettenberg said she would pass the complaints along to Dr. Chesbro, the dean, but nothing came of this. (*Id.*148:2-149:4). Later, she went directly to Dr. Chesbro, discussing Dawson's hostility and racism. (*Id.*). Chesbro said he would "talk to her about it." (*Id.* at 149:3-4). Hinton testified that she made other complaints verbally to Plettenberg through Spring 2016 and Fall 2016, to no avail. (*Id.* 148:2-7). In Fall 2016, Hinton also tried multiple times to go to Dr. Easley, the acting Chair of the HIM department. She was not even given a meeting time with Easley. (*Id.*80:16-81:7). This denial was at Dawson's behest. (*Id.*). Finally, Hinton met with Easley and complained verbally about the discriminatory environment, to no avail. (*Id.* at 150:14-152:10). Hinton tried to complain to Dr. Wilson but was denied a meeting. (*Id.* at 152:9-12).

On August 1, 2016, Dean Easley drafted a letter to Provost Wilson recommending that Hinton's contract be non-renewed.  (Pl. Evid. Ex. 7).  The reason given by Dean Easley for the non-renewal of Hinton's contract was due to lack of classes for her to teach stating "Currently the number of faculty in that department exceeds that required by the instructional load available for assignment." (Pl. Evid. Ex. 7).  Dean Easley did not inform. Hinton that she was making this recommendation that her contract be non-renewed.  (Pl. Evid. Ex. 3, Hinton Aff. ¶ 8).
Dean Easley did not review the handbook, personnel files or job duty assignments when making the decision to recommend that Hinton be non-renewed. (Pl. Evid. Ex. 20, Easley Depo. 134:21-135:18). Plaintiff had more teaching experience than Bridgette Stasher-Booker.  (Pl. Evid. Ex. 3, Simmons Aff. ¶ 11).  In addition, Dr. Simmons would limited to teaching only two (2) classes per semester because her job duties required her to be out in the field working with the internship program, and the Department Chair was limited in the number of classes she could teach.  (Pl.

Evid. Ex. 3, Simmons Aff. ¶ 11).  At the time Dean Easley made the decision to non-renew Ms. Hinton, there were enough classes for her to teach a full load within HIM.  (Pl. Evid. Ex. 3, Simmons Aff. ¶ 11).

On or about August 3, 2016, Dr. Plettenberg notified Ms. Hinton that for the Fall 2016 Semester she would be teaching two (2) classes in HIM and two (2) classes in the Criminal Justice Department.  (Pl. Evid. Ex. 3, Hinton Aff. ¶ 8).  Dr. Plettenberg informed Ms. Hinton that Dr. Wilson was assigning her to teach the two (2) Criminal Justice classes because they needed help covering classes in the Criminal Justice Department.  (Pl. Evid. Ex. 3, Hinton Aff. ¶ 8). When Dr. Plettenberg informed Ms. Hinton that she would be teaching the two (2) Criminal Justice classes, she did **not** inform Ms. Hinton that she was going to be non-renewed.  (Pl. Evid. Ex. 3, Hinton Aff. ¶ 8).

On Monday, August 15, 2016, Dr. Plettenberg called Ms. Hinton and informed her Dr. Wilson had called and stated that Ms. Hinton's contract was being non-renewed at the end of the Semester.  (Pl. Evid. Ex. 3, Hinton Aff. ¶ 9).  Dr. Plettenberg asked Ms. Hinton if she had received a letter yet from ASU notifying her of the non-renewal of her contract.  (Pl. Evid. Ex. 3, Hinton Aff. ¶ 9).  Ms. Hinton informed Dr. Plettenberg that she had not received a letter from ASU notifying her that her contract was being non-renewed.  (Pl. Evid. Ex. 3, Hinton Aff. ¶ 9). Dr. Plettenberg was upset in this conversation. (Id.) Dr. Plettenburg informed Ms. Hinton that she was not involved in this decision to non-renew her contract, and that it was made by Dean Easley and Provost Wilson.  (Pl. Evid. Ex. 3, Hinton Aff. ¶ 9).  Dr. Plettenberg also informed Ms. Hinton that "Dr. Chesbro is gone, now you are gone, and they will be coming for me next."

(Pl. Evid. Ex. 3, Hinton Aff. ¶ 9).  Dr. Plettenberg was placed on Administrative leave a short

while after this conversation.  (Pl. Evid. Ex. 3, Hinton Aff. ¶ 9).

 After Dr. Plettenberg was placed on leave in or around September 2016, Dean Easley

made Bridgette Stasher-Booker the Interim Department Chair.  (Pl. Evid. Ex. 18, Simmons Aff.

¶ 12).   Even though Dr. Plettenberg was the Department Chair, Dean Easley seemed to talk

more to Stasher- Booker than to Dr. Plettenberg about matters in the HIM Department prior to

Dr. Plettenberg going out on leave.  (Pl. Evid. Ex. 18, Simmons Aff. ¶ 12).

Prior to this August 15, 2016 phone conversation, Ms. Hinton had conversations with Dr.

Plettenberg complaining about the discriminatory treatment she was receiving from Brenda

Dawson and Mae Tullis.  (Pl. Evid. Ex. 3, Hinton Aff. ¶ 11).  Dr. Plettenberg told Ms. Hinton on

numerous occasions that "Ms. Dawson absolutely hates you. I want you to know all the things

she is saying about you. She is going to try to get you fired."  (Pl. Evid. Ex. 3, Hinton Aff. ¶ 11).

Ms. Hinton asked Dr. Plettenberg why someone she had never met until a few months prior and

had only had obligatory interactions with would "hate" her.  (Pl. Evid. Ex. 3, Hinton Aff. ¶ 11).

Dr. Plettenberg responded to Ms. Hinton "You are white. She treats all of the white faculty

terribly. You aren't the only one, just the latest one. And, on top of that, you are a white faculty

member working for a white department chair she hates hired by a white Dean that she hates."

Dr. Plettenberg then told Ms. Hinton "Now, they hate you, too. Watch your back."  (Pl. Evid. Ex.

3, Hinton Aff. ¶ 11).

 Hinton never received a letter in the mail from ASU advising her that her contract was

being non-renewed. (Pl. Evid. Ex. 1 p.6 ¶3). Rather, on September 26, 2016, Ms. Hinton was

called to the Dean's office and she signed for and was handed the letter from Provost Wilson

informing her that her contract was being non-renewed.  (Pl. Evid. Ex. 1, p. 6, ¶3).  This letter

was dated August 4, 2020.  (Pl. Evid. Ex. 8).  The envelope of this August 4, 2016 reflects that it

was mailed on August 8, 2016 and was notated as being "undeliverable" on August 9, 2016.  (Pl.

Evid. Ex. 9).  Plaintiff did not receive official written notification from ASU that her contract

was being non-renewed until she was given Dr. Wilson's letter on September 26, 2016. (Pl. Evid.

Ex. 1, p. 6, ¶3).

 Hinton's employment ended on December 31, 2016. (Pl. Evid. Ex, 10, Hinton Depo.,

exh 14). ASU hired three (3) black Adjunct Professors to teach four (4) HIM classes for Spring

2017 Semester. (Pl. Evid. Exs, 11, 12, and 13).  These three Adjunct Professors were hired to

teach HIM classes that Ms. Hinton could have taught.  (Pl. Evid. Ex. 18, Simmons Aff. ¶ 11; Pl.

Evid. Ex. 2, ¶2).  Ms. Hinton was replaced in her position of Assistant Professor in HIM by a

black female.  (Pl. Evid. Ex. 14 and 15; Pl. Evid. Ex. 24, Booker Depo. 133:15-134:1).

ASU's Faculty Handbook provides the policy for non-renewing a professor's contract.  (Pl. Evid.

Ex. 17 (part 1) p. 3-7, Section 3.3.2. E). The handbook provides:

> Written notice that a probationary faculty member will not be reappointed shall be given
> to the faculty member in advance of the expiration of his or her appointment as follows:
> Not later than March 1st of the first academic year of service if the appointment expires
> at the end of the year or, if a one-year appointment terminates during an academic year, at
> least three months in advance of its termination; Not later than December 15th of the
> second academic year of service if the appointment expires at the end of that year; Not
> later than May 31 before the expiration of an appointment after two or more years of
> service at the university.

Id. The ASU Faculty Handbook has different provisions for non-renewal of "Temporary"

appointments. (Id., Section 3.2.1.). Section 3.2.1. C provides: "The term of each temporary

appointment is clearly stated in the employment offer letter. . . . This type of appointment

automatically terminates and the faculty member is separated at the end of the specified period unless specific action is taken to extend or renew the stated appointment."

On February 9, 2017, Ms. Hinton filed a Charge of Discrimination with the EEOC on her own by going to the Birmingham office of the EEOC to file her Charge.  (Pl. Evid. Ex. 3, Hinton Aff. ¶ 12).  Plaintiff completed the EEOC's Intake Questionnaire in red ink. (Pl. Evid. Ex. 3, Hinton Aff. ¶ 12; Pl. Evid. Ex.1pp. 1-4). Plaintiff met with the EEOC Investigator assigned to assist her in filing her charge and discussed the facts regarding her claims and the Statement that she had prepared. (Pl. Evid. Ex. 3, Hinton Aff. ¶12). While meeting with the EEOC Investigator and discussing the facts of the claims of discrimination, he checked the box designated "Retaliation" in black ink. (Id.) Hinton signed the Charge of Discrimination drafted by the EEOC Investigator and left. (*Id.*)

This August 15, 2016 conversation with Dr. Plettenberg is what Hinton was referencing in her Statement provided to the EEOC in support of her Charge of Discrimination as the date she was notified that her contract was being non-renewed.  (Pl. Evid. Ex. 3, Hinton Aff. ¶ 10, exh. C). On or about May 19, 2017, pursuant to the EEOC Investigator's request, Plaintiff provided a written response to Defendant's Position Statement to her EEOC Charge.  (Pl. Evid. Ex 2). In Plaintiff's written response to the EEOC, she again addressed the retaliation against her and the difference in treatment of her due to her race in the terms and conditions of her employment.  (Pl. Evid. Ex 2).

## **STANDARD OF REVIEW**

Summary judgment may be rendered only when the court finds that the papers supporting and opposing the motion reveal that no issue of material fact exists and that the moving party is

entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "As the moving party, [the Defendant] has the burden of showing the absence of a genuine issue of material fact, and for these purposes the material it lodged must be viewed in the light most favorable to the opposing party." *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918, 919 (11th Cir. 1993).  The district court cannot weigh conflicting evidence or make credibility determinations; instead, "'the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Hairston*, 9 F.3d at 919 (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

Defendant has not met its burden and summary judgment is due to be denied in this matter.

## **ARGUMENT**

### I.     **DEFENDANT'S REPEATED ASSERTIONS REGARDING A HOSTILE WORK ENVIORNMENT CLAIM ARE INAPPORIRATE AND DUE TO BE DENIED**

Defendant spends a considerable amount of briefing regarding a claim that Plaintiff has made clear she is not asserting.  In Plaintiff's Response to Defendant's Motion to Dismiss (Doc. 11), Plaintiff makes clear that she is NOT asserting a separate claim for Hostile Work Environment. (Doc. 11 at pp.6-8). However, Defendant continues to argue in section I. pp. 8-9 of its brief in support of Summary Judgment, that Plaintiff did not plead a claim for Hostile Environment. This correct because Plaintiff did not assert a separate claim for Hostile Work Environment in her complaint as she clearly stated in response to Defendant's Motion to Dismiss. (Doc. 11 at pp.6-8).  Additionally, Defendant's arguments in section II. (B) pp. 14-18 concerning Plaintiff's Hostile Work environment are nothing more than an impressible attempt

to strike evidence from Plaintiff's case. Even after Plaintiff has made it crystal clear she is not asserting a claim for Hostile Work Environment, Defendant nevertheless lists points of testimony as Hinton's claim of Hostile Environment in arguing this Court grant summary judgment as to any Hostile Work Environment Claims. (Doc. 44 pp. 14-16).  Plaintiff merely sets forth facts of Defendant's discriminatory conduct towards her during her employment to support her claims of racial discrimination and retaliation.  While Plaintiff is not making a separate claim for some of these discriminatory acts against her, she is still entitled to state the facts of and circumstantial evidence of such to help prove her claims. See *Allen v. Montgomery County, Ala.,* 788 F.2d 1485, 1488 (11th Cir. 1986) (recognizing the difficulty of proving discriminatory intent and even evidence of time-barred incidents of discrimination may be used as support for claims)

Defendant's Motion to for Summary Judgment with regards to any possible Hostile Work Environment "claims" is due to be denied because it is procedurally improper.  Rule 56(a) of the Federal Rule of Civil Procedure entitles a party to move for summary judgment on only a "claim or defense - or the part of each claim or defense". Fed. Civ. Proc 56. Accordingly, a Court would be unable to dismiss a claim that was never asserted in the first place.  See *First Am. Corp. v. Al-Nahyan*, 175 F.R.D. 411, 414 D.C. Dist. 1997) ("A ruling granting summary judgment on a matter not in controversy would be advisory in nature and clearly inappropriate").

As Plaintiff has made clear, she is not asserting a claim for hostile work environment. Defendant's Motion merely seeks to dismiss Plaintiff's facts regarding the discriminatory and retaliatory conduct she was subjected to during her employment. This is an inappropriate attempt to argue evidence issues which are not appropriate at this juncture.  Accordingly, Defendant's Motion with respect to any claims regarding Hostile Work Environment in sections, I. pp. 8-9, II.

13

(B) pp. 14-18, and V. pp. 31-37 of its Brief in Support of Summary Judgment are due to be

denied.

## II.      HINTON EXHAUSTED HER ADMINISTRATIVE REMEDIES

### A. Plaintiff's EEOC charge was timely.

Defendant is convoluting Plaintiff's testimony by lumping Plaintiff's acknowledgment

that she was informed she would be teaching two classes in the criminal justice department prior

to August 4th, 2016, to argue that she acknowledged that she was informed she was being non-

reappointed.  (Doc. 44 pp. 12-13). However, the facts in the record show that Plaintiff was

informed by Dr. Plettenburg on Monday August 15, 2016 that her contract was going to be non-

renewed at the end of the semester. (Pl. Evid. Ex. 1 p 6 ⁋3; Pl. Evid. Ex.3⁋⁋ 8-10). When

Plaintiff filed her EEOC charge she attached a written statement with her intake questionnaire

(Pl. Evid. Ex. 1 pp. 6 ⁋3). In that document, Plaintiff writes that on or about Monday August 15,

2016 that Dr. Plettenburg

> asked me if I had received a certified letter or other official communications notifying me
> that my faculty contract was going to be non-renewed and that the Dean stated she was
> going to non-renew me. I told my former Department Chair that I had not received the
> letter or any notification

 (*Id*). During this conversation, Dr. Plettenburg appeared to be upset and informed Plaintiff that

she was not involved in the decision to non-renew her contract. (Pl. Evid. Ex.3⁋⁋ 8-9). Plaintiff's

evidence regarding when she was verbally informed that her contract would be non-renewed is a

question of material fact that precludes summary judgment. In viewing the facts in the light most

favorable to Plaintiff, she was required to file her EEOC charge within 180 days of August 15,

2016, which she did.[1] Accordingly, drawing the facts in the light most favorable to Hinton , a genuine dispute exits and summary judgment is improper.

### B. Plaintiff exhausted her administrative remedies for her retaliation claim.

As discussed above in Section I, Plaintiff is not asserting a claim of Hostile Work Environment and Defendant's Motion for those claims is due to be denied. Regarding Plaintiff's retaliation claim, Plaintiff exhausted her administrative remedies.  Plaintiff had a good faith basis for alleging a retaliation claim in Count Two of her Complaint due to the EEOC reasonably being able to investigate the reasons behind Plaintiff's termination.  The purpose of the exhaustion requirement is to allow the EEOC the "first opportunity to investigate the alleged discriminatory practices [and] perform its role in obtaining voluntary compliance and promoting conciliation efforts." *Batson v. Salvation Army*, 897 F.3d 1320, 1327( 11th Cir. 2018) citing  *Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1279 (11th Cir. 2004).  Plaintiff's judicial complaints are limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination. *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970)).  However, "the civil action is much more intimately related to the EEOC investigation than to the words of the charge which originally triggered the investigation". *Id.*  Further, the courts have been "extremely reluctant to allow procedural technicalities to bar claims brought under [discrimination statutes].", and the scope of an EEOC complaint should NOT be strictly interpreted. *Gregory,* 355 F.3d at 1280. (quoting *Sanchez at* 460-61).

In *Batson*, the Eleventh Circuit reaffirmed the principles of *Sanchez* and *Gregory* stating:

---

[1]  180 days from August 15, 2016 falls on Saturday February 11, 2017, which made her EEOC charge due by the next business day which was Monday February 13, 2017.

In *Gregory*, for example, we held that although the plaintiff had not checked the retaliation box on the document, she filed with the EEOC, "the exhaustion requirement was nonetheless satisfied" because the EEOC's "investigation . . . would have reasonably uncovered any [*1328] evidence of retaliation." *Id.* at 1278. To determine whether a plaintiff has exhausted her administrative remedies, then, the "proper inquiry" is whether the "[plaintiff's] complaint [is] like or related to, or grew out of, the allegations contained in [the] EEOC charge." *Id.* at 1280.

*Batson v. Salvation Army*, 897 F.3d 1320, 1327-1328.

Like the Plaintiffs in *Batson*, and *Gregory*, Plaintiff filed an EEOC charge without retaining counsel.  Plaintiff's EEOC charge form does not have the retaliation box checked. However, Plaintiff presented the EEOC with information and written statements containing information that allowed the EEOC to investigate the circumstances leading up to and following Plaintiff's termination.  When Plaintiff met with the EEOC Investigator to file her Charge, she filled out the Intake Questionnaire, attached a written statement, and provided information during an interview. During this interview and review of information, the EEOC Investigator marked the "retaliation box" on Plaintiff's Intake Questionnaire and informed Plaintiff of the same. (Pl. Evid. Ex. 1 p. 2; Pl. Evid. Ex. 3 ¶12). Moreover, Plaintiff's response to Defendant's Position Statement also discusses Plaintiff's beliefs about Defendant's discriminatory and retaliatory treatment of her and others. (Pl. Evid. Ex. 2) While Plaintiff may not have been able to fully articulate all her potential legal claims, she provided enough information to allow the EEOC to investigate her claims and fulfill her administrative requirements. See *Sanchez v. Standard Brands, Inc*., 431 F.2d 455, 462. ("In the context of a statute like Title VII it is inconceivable that a charging party's rights should be cut off merely because he fails to articulate correctly the legal conclusion emanating from his factual allegations. Surely the only procedural requirement which

should confront a Title VII complainant is the requirement that he state, within the ninety-day period, *facts* sufficient to trigger a Commission investigation.").

Not only did Plaintiff provide enough information to trigger an investigation into the circumstances surrounding her termination, but her statements and the actions of the Investigator indicate that the EEOC had proper notice of a potential retaliation claim, and reasonably could have investigated evidence of retaliation. The scope of the EEOC investigation was broad enough to include the evidence of retaliation and thus Plaintiff's retaliation claim is proper. *Smith v. Sentry Ins*., 674 F. Supp. 1459, 1467 (N.D. Ga. 1987) ("In short, a judicial complaint of employment **discrimination** may include any allegations of **discrimination** encompassed by an EEOC investigation, even if the EEOC investigation was arguably broader than the EEOC charge triggering the investigation.")  Therefore, Plaintiff exhausted her administrative remedies and the Court should Deny Defendant's Motion for Summary Judgment on these grounds.

## III.   ASU DISCRIMANTED AGAINST HINTON DUE TO HER RACE.

### A.  The evidence in the Record establishes a *prima face* case for discrimination

Defendant incorrectly argues that Plaintiff cannot make out a prima *facie* case focusing entirely on the concept of "comparators" under Defendant's interpretation of *Lewis v. City of Union City, Ga.*. However, "The methods of presenting a prima facie case are not fixed; they are flexible and depend to a large degree upon the employment situation." *Wilson v. B/E Aero., Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004). The Eleventh Circuit has made clear that establishing the elements of *McDonnel Douglas* is not the *be all, end all way* for Plaintiff to survive a motion for summary judgment. *Smith v. Lockheed-Martin Corp.,* 644 F.3d 1321, 1328 (11th Cir. 2011). Further, in *Lewis v. City of Union City, Georgia*—the Eleventh Circuit explicitly preserved the

"convincing mosaic" framework. 918 F.3d at 1220 n.6. "[N]o matter its form, so long as the circumstantial evidence raises a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper." *Smith* at 1328.

*Rioux v. City of Atlanta, Georgia* offers a helpful example of the factors that can help establish a "convincing mosaic" of discrimination. 520 F.3d 1269 (11th Cir. 2008). There, the Eleventh Circuit denied summary judgment against the plaintiff, a white high-ranking fire officer who was demoted for overly aggressive behavior to a subordinate. *Id.* at 1272. His supervisor attempted to replace him with an African American employee but finally settled on an Asian woman to fill his role. *Id.* Although Rioux met some of the *McDonnell Douglas* criteria— he was qualified for the job, he was demoted, he was replaced by someone outside his race—the court found there was no proper comparator. *Id.* at 1277. Even so, the court found a convincing mosaic based on the following: (1) the fire department's hiring practice involved efforts to maintain racial balancing, (2) the employer consulted racially-motivated persons in making the hiring decision, (3) the list of replacements for the plaintiff included three candidates, all black, (4) the plaintiff's rule violation was a product of his employer's own erroneous instruction, (5) the plaintiff's peers lodged racially-motivated complaints against him, (6) "differences in manner and degree" of investigation into white versus black employees, and (7) evidence that the proposed comparator, though not meeting the *McDonnel Douglas* test, was similar in many respects, but treated disparately. *Id.*.; *see also Smith v. City of New Smyrna Beach*, 588 Fed. Appx. 965, 976 (11th Cir.2014)(internal citation omitted)(finding a convincing mosaic based on "1) suspicious timing, ambiguous statements, similar behavior directed at other members of the protected group, and 'other bits and pieces from which an inference of discriminatory intent might be drawn'; (2)

systematically better treatment of those outside the protected class; and (3) pretext in the employer's justification.").

Ample evidence of a "convincing mosaic" of discriminatory intent exists here. Influential staff within HIM, including Brenda Dawson, regularly ridiculed the HIM department as "the white house" of ASU, because of the racial makeup of its students and faculty. (Pl. Evid. Ex. 18, Simmons Aff. ¶ 8; Pl. Evid. Ex. 20, Easley Dep., 100:12–21). Easley agreed that such comments were commonly said about HIM. (Pl. Evid. Ex. 20, Easley Dep., 100:12–21). Stasher-Booker, who served as department Chair during Fall 2016 used racial epithets, including calling Hinton a "white bitch." (Pl. Evid. Ex. 18, Simmons Aff. ¶ 8). Tullis, secretary for the department, told other black faculty that Hinton was different "from us," (Pl. Evid. Ex. 18, Simmons Aff. ¶ 6), and that HIM had "too many white employees," (*Id.*). These recurring events, which are more overtly racist than the "ambiguous statements," reveal a culture of racism in the HIM department and created a reasonable inference of discriminatory intent. *Smith*, 588 Fed. Appx. at 976.

Hinton was also systematically treated worse than African American faculty in HIM. She was denied basic teaching privileges available to black faculty, including an access card to the building and an office key. (Pl. Evid. Ex. 10, Hinton Depo. 84:5-86:14). The culprit was Dawson, again. Another time, Hinton was left out of a group reservation for lodging on a faculty trip, while all others were provided for. (Pl.  Evid. Ex. 10, Hinton Depo. 99:2-104:13). She was not reimbursed for this trip until a year and half later, when she left ASU. (*Id.* 104:14-19.). Finally, Tullis and Dawson were instrumental in baring Hinton from receiving her final paycheck until Hinton enlisted the help of an ASU trustee to intervene. (Pl. Evid. Ex. 10, Hinton Dep., 119:1–23). Hinton tried to report these racist incidents to Easley, but Easley took no action and made no

19

response. (*Id.* at 152:3–8). Hinton also emailed Easley; nothing changed. (Pl. Evid. Ex. 28, Hinton Grievance). These facts show that Hinton's peers were racially motivated, *Rioux*, 520 F.3d at 1272, and they show "systematically better treatment of those outside the protected class," *Smith*, 588 Fed. Apps. at 976. Further, when Simmons, a black faculty member, refused to participate in the racism towards Hinton, she experienced retaliation from her black coworkers. This shows a "differences in manner and degree" of how Hinton and her allies in the department were treated. *Rioux*, 520 F.3d at 1277.

Additionally, there is evidence of similar behavior against other members of the protected group. *Smith at 976.*  First, Dean Chesbro was replaced as the Dean of the College of Health Sciences by a black female, Cheryl Easley.  (Pl. Evid. Ex. 18, Simmons Aff. ¶ 12; Pl. Evid. Ex. 20, Easley Depo. 20:7-12, 38:18-39:2, exh. 15, pp. 7, 12).  Dr. Plettenberg (white department chair) was replaced by Bridgette Stasher-Booker (black female) the Interim Department Chair and ultimately the department chair.   (Pl. Evid. Ex. 18, Simmons Aff. ¶ 12).   This was just as Plettenberg predicated, when she told Plaintiff "Dr. Chesbro is gone, now you are gone, and they will be coming for me next." (Pl. Evid. Ex. 3, Hinton Aff. ¶ 9).

Easley's decision to non-renew Hinton is also shrouded in racism and ill-informed opinions, showing a mosaic of discrimination. Easley's non-renewal decision was a sham. She did not examine any personnel files of faculty, including Hinton. (Pl. Evid. Ex. 20, Easley Dep., 132:6–10; Dep.134:21-135:12.) She did not investigate the probationary status of HIM faculty or ASU Handbook standards for non-renewal procedures. (*Id*. at 135:17–20). She did not ask about teaching qualifications or successful outcomes. (*Id.* at 126:21–128:5). She eyeballed what courses would be offered in the spring and did not rethink this estimation even as Plettenberg went on

leave during Fall 2016. (*Id.* at 137:9–138:20; 129:16–20). When hiring the adjuncts, she did not consider whether Hinton—a former adjunct herself—should be rehired as an adjunct. (Pl. Evid. Ex. 21, Pettis Dep., 131:1–5). Instead what guided Easley's decisions about the HIM department including ending Hinton's employment in December 2016, was her conversations with Brenda Dawson and Stasher-Booker. (Pl. Evid. Ex.20, Easley Dep.132:21-135:12; Pl. Evid. Ex. 18, Simmons Aff. ¶ 12). These two had a clear history of racial animas towards Plaintiff.

Brenda Dawson regularly showed racism and antagonism toward Hinton, so her input in the non-renewal decision raises a strong inference of discrimination. Hinton testified that Dawson, Operations Manager of the Health Sciences College, "hated me because I was hired by the white dean and the white department chair, and [she] was white." (Pl. Evid. Ex. 10, Hinton Dep., 63:9–10.) Dawson was also one of the people calling the HIM department the "white house"; Hinton heard this on two occasions. (*Id.* at 71:3–7.) Dawson also had a history of exploiting her role as the Dean's assistant to act on her racism by lodging petty complaints against Hinton to her supervisor, Plettenberg. (Pl. Evid. Ex. 10, Hinton Dep., 66:3–19). Dawson would call Plettenberg with a grievance against Hinton, and Hinton would be forced to listen to Dawson's disparaging comments. (*Id.*). Dawson even prevented Hinton access to necessities of her job: a keycard to the building and business cards. (*Id.* at 84:5-86:14). Dawson did not deny that these were her responsibilities, (Pl. Evid. Ex. 19, Dawson Depo. 47:1-50:12), but her memory fogged as to why Hinton did not get them. Finally, Dawson was well-poised to influence Easley. Easley learned Hinton's employment history, including who hired her, from Dawson. (Pl. Evid. Ex.20, Easley Dep.132:21-135:12). Dawson also *sat in on Easley's own hiring interviews*, an influential position. (Pl. Evid. Ex. 19, Dawson Dep., 58:22–23.) These facts raise at least a triable fact as to the issue

21

of Dawson's discriminatory intent and its influence on Easley's decision to non-renew Hinton. Easley admitted that Dawson influenced her decision to non-renew Hinton. (Pl. Evid. Ex.20, Easley Dep.132:21-135:12). Thus, her racist and combative opinions about Hinton likely had considerable influence over Easley's decision. The influence of Dawson, an overt racist, over Easley's non-renewal decision shows a convincing mosaic of discrimination, just as in *Rioux*. 520 F.3d at 1277.

Stasher-Booker's influence over Hinton's non-renewal decision also raises an inference of discrimination. Stasher-Booker stepped into a key role in Fall 2016, filling the department chair position when Plettenberg went on leave. (Pl. Evid. Ex. 20, Easley Dep., 145:2–10). Stasher-Booker being in this position of influence effectively ended any chance Hinton had of being considered for the newly available instructional hours. In a formal grievance to ASU administrators, Stasher-Booker was reported to have called Hinton and other white faculty in HIM "white bitches." (Pl. Evid. Ex. 29, Simmons Grievance, 02158; Pl. Evid. Ex. 18, Simmons Aff. ¶ 9). It was also reported that Easley turned to Stasher-Booker's guidance in key decision-making. (*Id*. at 02158.) Further, Stasher-Booker had breached Hinton's confidence by reviewing her personnel file and disciplinary matters in the presence of other ASU staff. (Pl. Evid. Ex. 28, Hinton Grievance, 02256). Below, Hinton makes the argument that Stasher-Booker is a similarly situated comparator to Hinton. But even if she is not, she is similar enough that Easley's permission of Stasher-Booker's racist antagonism shows a mosaic of discrimination, as in *Rioux*. 520 F.3d at 1272. Further, her influence over Easley's non-renewal decision, raises an inference of discrimination.

Finally, the hiring of three black adjuncts to replace Hinton is evidence of a mosaic. Below, Hinton argues that these adjuncts are similarly situated, or, in most cases, less qualified to teach the courses that Hinton formerly taught. Even so, they were hired to fill her shoes. Recall that in *Rioux*, where the shortlist of *potential* replacements for the plaintiff included only three black candidates, the court found a convincing mosaic of discrimination. 520 F.3d at 1272. Here, it was not a shortlist—ASU hired three black faculty and not a single white faculty to replace Hinton.

This evidence establishes (1) Hinton's replacement by three black faculty, (2) Easley's sham non-renewal decision, (3) Dawson and Stasher-Booker's racist influence over that decision, (4) the ongoing treatment of Hinton as the HIM departments "white bitch," and (5) Easley's apathy to fix any of these issues. The evidence thus presents a strong inference and a convincing mosaic of discrimination.

Genuine disputes of material facts exist in another category used in the circumstantial mosaic analysis: the employer's pretextual justification. *Smith v. City of New Smyrna Beach,* 588 Fed.Appx. 965, 976 (11th Cir.2014). ASU repeatedly asserts that it fired Hinton for lack of instructional load. (Doc. 44 p. 30). But a genuine issue of material fact exists as to Hinton's instructional load. At the time Dean Easley made the decision to non-renew Ms. Hinton, there were enough classes for her to teach a full load within HIM.  (Pl. Evid. Ex. 3, Simmons Aff. ¶ 11). ASU only produced an unmarked, undated spreadsheet listing courses and professors. (Pl. Evid. Ex. 33, Teaching Schedule). Cheryl Easley could not dispute Hinton's claims and admitted that the ASU spreadsheet "d[id] not look like an accurate" account because it indicated class-teacher pairings that were not approved, and that document was not how the schedule originally looked. (Pl. Evid. Ex. 20, Easley Dep., 140:5: -142:2, 145:2-19).

For the Fall of 2016, the semester that Hinton was non-renewed, there is no dispute that Hinton met her instructional load. (Pl. Evid. Ex. 20, Easley Dep., 129:1–2). HIM administration recognized that Hinton might not have enough classes for the fall semester, so they split her teaching with two courses in the HIM department and two in Criminal Justice. (Pl. Evid. Ex. 10, Hinton Dep., 91:3-7). Hinton testified that Criminal Justice was a good fit; her supervisor shared with her that her students "liked [her] classes very much and he had gotten very positive feedback about [her]." (*Id.*, 136:4–5.) Operating under the view that there was a lack of instructional load, Hinton campaigned to pursue a joint appointment in the HIM and other departments, including Criminal Justice, History, and Political Science. (Pl. Evid. Ex. 30, Hinton Email to Erhunmwunsee 8/24/16.) If ASU had been willing to consider this solution, even the temporary instructional load problem would have gone away entirely. But it did not.

In Fall 2016, a full-time professor, Cheryl Plettenberg went on administrative leave, creating a need for faculty to teach her courses. (Pl. Evid. Ex. 20, Easley Dep., 145:6-19). Faculty in the HIM department immediately felt the resulting strain of having to pull "extra loads." (Pl. Evid. Ex. 26, Simmons' E-mail to Stasher-Booker 10/12/16). After Dr. Plettenberg(white) was placed on leave in or around September 2016, Dean Easley made Bridgette Stasher-Booker (black) the Interim Department Chair.  (Pl. Evid. Ex. 18, Simmons Aff. ¶ 12).  Defendant did not offer any of Dr. Plettenberg's classes to Plaintiff to teach during the Fall of 2016 semester. (Pl. Evid. Ex. 20, Easley Dep., 145:6-146:7).  Rather Plettenburg's classes were supposedly given to Stasher Booker, who already had a full load. (Pl. Evid. 33).  Also, during the Fall 2016 semester, it is undisputed that Hinton's contract remained active during the entire Fall 2016 semester, such that her non-renewal could be withdrawn, and she could be renewed to fill the gaps. (Pl. Evid. Ex. 7,

Memorandum from Easley 8/1/16, 000004). Easley knew this fact. (Pl. Evid. Ex. 20, Easley Dep., 151:4–8). Further, instructors were not assigned to Spring courses until during the Fall semester— the same time that HIM faculty were expressing concern over the shortage of faculty that would exist in the coming spring. (Pl. Evid. Ex. 20, Easley Dep., 139:5–6). In Fall 2016, ASU could have easily renewed Hinton to teach the Spring 2017 classes left available by Plettenberg. But it did not.

Instead they hired three adjunct professors, all of whom were black. This act lays to rest any question that the instructional load excuse was pretextual. Given Plettenberg's absence, the administration began to recognize that it would be "next to impossible" for the existing faculty to teach the courses that were to be offered in Spring 2017. (Pl. Evid. Ex. 20, Pettis Dep., 131:14). In Spring 2017, three adjuncts were hired to literally fill Hinton's shoes—they taught the same courses, to the same students, in the same department, with the same supervisors and expectations. (*See* Pl. Evid. Ex. 11, Braddy Notice of Employment, 00900; Pl. Evid. Ex. 13, Baggett Notice of Employment, 00034; Pl. Evid. Ex. 12, Simpson Notice of Employment, 00006.)

All three professors were black. (*See* Pl. Evid. Ex. 11, Braddy Notice of Employment, 00900; Pl. Evid. Ex. 13, Baggett Notice of Employment, 00034; Pl. Evid. Ex. 12, Simpson Notice of Employment, 00006). Hinton was more qualified to teach HIM courses, had a longer history with ASU, and was willing and able to fill the instructional needs in Spring 2017. (*Compare* Ex. 31, Braddy Application, ASU RFPD 00906; *with* Ex. 32, Hinton Resume, ASU INT DISC 000019–23). Further, Braddy's Master's degree was less impressive than Hinton's all-but-dissertation PhD. (*Id.*). And Hinton had considerably more teaching experience and experience at ASU. (*Id.*). Although, ASU's administrators believe that "it is better to have full-time faculty" than

adjuncts, and better to have someone in person, (Pl. Evid. Ex. 22, Wilson Dep., 30:20–21), the adjuncts they hired to teach these courses all lived out of state and were not physically on campus to teach the students. (Pl. Evid. Ex. 20, Easley Dep., 147:16–21).   The adjuncts were less qualified and had less teaching experience than Hinton, but they were nonetheless hired to replace Hinton and teach her classes. Additionally, Hinton's position of assistant professor was filled by a black female.  (Pl. Evid. Ex. 14 and 15; Pl. Evid. Ex. 24, Booker Depo. 133:15-134:1).

The above evidence establishes that (1) there was an emerging excess, rather than lack, of instructional load in Fall 2016, (2) Hinton was in the perfect position to pick up this excess, (3) Hinton was campaigning to do just that, either through joint appointment or otherwise, and (4) ASU filled its unmet teaching needs with three adjuncts, all of whom were black, and ultimately replaced her Assistant Professor position with a black female. This evidence rebuts ASU's proposed nondiscriminatory justification for Hinton's non-renewal and indicates a convincing mosaic of racial discrimination.

Accordingly, a genuine issue of material fact exists, and summary judgment is due to be denied.

### B. Hinton Meets her burden of Proof for a *Prima Facie* Case under *McDonnel Douglas.*

Although Plaintiff contends that the evidence creates a jury question regarding ASU's discriminatory intent, she will nonetheless address ASU's arguments under *McDonnel Douglass.* ASU concedes that Hinton was a member of a protected class, she suffered an adverse employment action, and she was qualified for her position. (Doc. 44 pp. 21.) This leaves only one element of the *McDonnell Douglas prima facie* case in dispute—whether ASU treated a "similarly situated"

employee outside Hinton's racial class more favorably. *See Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1221 (11th Cir. 2019) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

As the Eleventh Circuit has stated, "discrimination consists of *treating like cases differently*." *Lewis v. City of Union City, Ga.*, 918 F.3d at 1222. In *Lewis*, the Eleventh Circuit clarified that a comparator in Title VII cases must be "similarly situated in all material respects." *Id.* at 1224. This standard requires the persons to share similarities including, for example, engaging in the "same basic conduct," being subject to the "same employment policy," falling under the "same supervisor," and a shared "employment or disciplinary history," including levels of experience. *Id.* at 1227. In the end, the comparator analysis does not seek "exact correlation," but rather, "apples should be compared to apples." *Id.* at 1226.

Hinton had two similarly situated comparators at ASU. First, are the three black adjunct faculty members hired in Spring 2017. They were less qualified, had less teaching experience, and less experience in the HIM field than Hinton. Still, they were hired to replace Hinton, teaching the courses that she left behind. Second, there is Bridgette Stasher-Booker, a black Assistant Professor who had the same job, the same salary, and the same required RHIA certification. Further, Hinton had more teaching experience and a longer contractual relationship with ASU than Stasher-Booker. Even so, she was non-renewed while Stasher-Booker was retained.

### i.   The adjunct faculty hired in Spring 2017

Three black adjunct faculty replaced Amy Hinton in Spring 2017. Courts recognize that when an employee is replaced, the "comparator" prong of the *McDonnell Douglas* framework changes slightly. The plaintiff must prove only "that she was replaced by someone outside the

protected class." *Hinson v. Clinch Cnty., Ga. Bd. of Educ.*, 231 F.3d 821, 828 (11th Cir. 2000). Even so, the traditional markers of a comparator, identified in *Lewis*, strengthen the case. *See Lewis*, 918 F.3d at 1227.

In every respect articulated in *Lewis*, Hinton and the adjunct faculty are "similarly situated" comparators. In Spring 2017, three adjuncts were hired to literally fill Hinton's shoes—they taught the same courses, to the same students, in the same department, with the same supervisors and expectations. (*See* Pl. Evid. Ex. 11, Notice of Employment for Sonya Braddy, 00090; Pl. Evid. Ex. 13, Notice of Employment for LaTonia Baggett, 00034; Pl. Evid. Ex. 12, Notice of Employment for Tyrone Simpson, 00006). When she was hired in Spring 2017, Sonya Braddy taught the same course (HIM 210) that Hinton taught the prior year. (Pl. Evid. Ex. 33, Teaching Schedule, 00453–54). This is undoubtedly the "same basic conduct" under *Lewis*. As professors in HIM, they had the same supervisor and were subject to the same employment policy, as described in *Lewis*. But Braddy's Master's degree was less impressive than Hinton's all-but-dissertation PhD. (*Compare* Pl. Evid. Ex. 31, Braddy Application, 00906; *with* Pl. Evid. Ex. 32, Hinton Resume, 000019–23). And Hinton had considerably more teaching experience and experience at ASU. (*Id.*) She is thus a similarly situated or more desirable candidate to retain as a professor than the adjuncts.

The difference between Hinton's and the adjuncts' pay is irrelevant to the comparator analysis because it is irrelevant to ASU's stated reasons for non-renewing Hinton. ASU repeatedly asserts that lack of instructional load—not pay disparity—is the sole reason for Hinton's non-renewal. (*See* Pl. Evid.  Ex. 22, Wilson Dep. 108:18–19; Pl. Evid. Ex. 20, Easley Dep., 123:18–124:4). F*or the first time in this case*, ASU states that the pay difference between adjunct and full-time faculty prohibits comparison between the two. (Doc. 44pp. 21–22). This purported difference

directly contradicts ASU's repeated and sole justification for non-renewing Hinton—lack of instructional load. (Doc. 44 pp. 19–20; See also Pl. Evid. Ex. 7). As explained above, the adjuncts directly replaced Hinton by picking up her teaching load. Add to this that Hinton was similarly—or more—qualified for the professorial role, and the comparison between Hinton and the adjuncts cuts in Hinton's favor.

Further, Hinton's failure to apply for adjunct positions does not disqualify the newly hired adjuncts as comparators. For starters, Hinton testified that she did not expect ASU to be hiring new professors, given the supposed lack of instructional load for current professors. (Pl. Evid. Ex. 10, Hinton Depo., 179:8–12). And ASU offers no evidence that they published the adjunct positions in a way that Hinton could apply for it. ASU cites *Lewis v. Montgomery Fitness, Inc.* for the view that all aggrieved employees must reapply for a job in order to prove comparator status with new employees replacing them. (Doc. 44 pp. 23–24 (*citing Lewis*, No.: 2:17-cv-407-ECM, 2019 WL 2126702 (M.D. Ala. May 15, 2019)). ASU's argument is wrong in two respects. One, the facts of *Lewis* do not support this view. Comparator status was denied in *Lewis* for *three reasons* (not one), including that the plaintiff and comparator did not have the same job duties—one was a cleaner while the other was a desk manager. *Id.* at *4. Hinton and the adjuncts had identical duties—teach the same classes. Second, Eleventh Circuit precedent has no reapplication requirement. For example, in *Stamey v. Southern Bell Tel. & Tel. Co.*, the employer told a 58-year-old plaintiff that her job would be eliminated and—unlike ASU here—gave her several options for internal reappointment. 859 F.2d 855, 858 (11th Cir. 1988). Stamey refused these offers. Even so, the court found that she had been replaced by a younger comparator. *Id.*; *see also Hinson*, 231 F.3d at 828 (finding comparator when female employee was replaced by man, despite not reapplying for her

29

old job). If Stamey's refusal of an explicit job offer does not destroy comparator status, then Hinton's failure to reapply for a job she had no reason to know would exist certainly does not.

Because, the adjuncts are situated in all material aspects they are proper comparators.

ii.   Bridgette Stasher-Booker

Bridgette Stasher-Booker is similarly situated to Amy Hinton in all material respects. Each held the role of Assistant Professor in the Health Information Management (HIM) department. (Pl. Evid. Ex. 6, Hinton Notice of Employment, 000010; Pl. Evid. Ex. 16, Notice of Employment for Stasher-Booker, 01610). They thus were under the same employment policies and supervisors. *Lewis*, 918 F.3d at 1222. Each made almost identical salaries—around $66,000. (*Id.*). And each had an RHIA certification, required for professors in the HIM department. Pl. Evid. (Pl. Evid. Ex. 32, Hinton Resume, 000019; Pl. Evid. Ex. 34, Stasher-Booker Resume, ASU RFPD 01631). Stasher-Booker began teaching at ASU only one semester before Hinton, in January 2015. Pl. Evid. (Ex. 13, Notice of Employment for Stasher-Booker). Hinton taught as an adjunct at ASU in Fall 2015 and was promoted to Assistant Professor in Spring 2016. Pl. Evid. (Ex. 4, Hinton's Notice of Employment, 000009; Pl. Evid. Ex. 6, Hinton Notice of Employment, 000012). Not identical employment histories with ASU, but certainly "apples to apples." *Lewis*, 918 F.3d at 1226.

In many regards, Hinton was more qualified to be retained than Stasher-Booker. Hinton had worked for ASU the preceding three years as a Senior Research and Policy Analyst for ASU's Center for Public Policy. (Pl. Evid. Ex. 10, Hinton Dep., 20:15 *et seq*.) Stasher-Booker was brand new to ASU when she was hired. (Pl. Evid. Ex. 34, Stasher-Booker Resume, 01631–51). Hinton also had three years of prior teaching experience, including a semester as an adjunct professor at

ASU. (Pl. Evid. Ex. 32, Hinton Resume, 000019–23; Pl. Evid. Ex. Hinton's Notice of Employment, 000030). Stasher-Booker had no teaching experience. (Pl. Evid. Ex. 34, Stasher-Booker Resume, 01631–51.) Indeed, Stasher-Booker's interviewers at ASU took notice that she had "no HIM experience, no teaching experience, [and] health care administration experience, but a very different field." (Pl. Evid. Ex. 35, Screening Form, 01623.) None of these concerns were true for Hinton. Thus, in all material respects, Hinton and Stasher-Booker were similarly situated—or Hinton was more qualified—as Assistant Professors in July 2016, when Easley was deciding who to non-renew.

ASU disputes Stasher-Booker as a comparator by incorrectly arguing that she could not be non-renewed until May 2017.  This conclusion relies on the faulty premise that Stasher-Booker was in her second year as a probationary Assistant Professor in July 2016, when Cheryl Easley was deciding who to non-renew. (Doc. 44 p. 29.) Bridgette Stasher-Booker was hired in January 2015 as an Assistant Professor on "probationary" status. (Pl. Evid. Ex. 16, Stasher-Booker Notice of Employment, 01610.) This means that she would have been in the middle of her *second year* of teaching in July 2016. ASU argues that she was in her third year of teaching, based on being designated as probationary "1 year" in her employment contract. (*Id.*). There is a triable issue as to whether Stasher-Booker was properly in her second year, since she had *no prior teaching experience*—in any context—before January 2015. Hinton, after all, was granted a status of probationary "0 years," even though she had taught before and had taught a semester as an adjunct *at ASU*. (Pl. Evid. Ex. 6, Hinton Notice of Employment, 000012). ASU does not attempt to defend why Stasher-Booker would be extended the unwarranted courtesy of a probationary year that Hinton did not receive, despite facts to the contrary.

31

There is also a triable issue as to when Stasher-Booker could have been non-renewed in July 2016. As explained above, Stasher-Booker was in her second year of teaching in July 2016, not her third. The policy for when mid-second-year probationary faculty can be non-renewed is unclear. ASU's Handbook provides that mid-second years can be notified by December of the year they are being non-renewed, but only if the contract is set to expire in May. (Pl. Evid. Ex. 17, ASU Faculty Handbook, 3.3.2 E, 00376). Since probationary contracts renew annually, (*id.* 3.2.1. A, 00369), Stasher-Booker's contract was set to end in January, not May. Presumably her contract could be non-renewed a semester ahead of time, just as December was the final date that a May contract could be non-renewed. If so, *Stasher-Booker's timeline was the same as Hinton*—she could be given notice of non-renewal in July, one semester before termination of contract in December. Easley, for her part, did not review any documents concerning any of this—each professor's contractual status or the handbook policies for non-renewal—while deciding who to non-renew. (Pl. Evid. Ex. 20, Easley Dep., 135:2–7). ASU policy's silence on these issues presents, at the very least, a triable issue of fact.

Further, ASU wrongly emphasizes the urgent need to non-renew faculty for lack of hours. If there were a need to shed faculty as quickly as possible, then ASU's efforts to distinguish Hinton and Stasher-Booker based on the timeframe of their non-renewal date would be correct. This was not the case. Rather, while Hinton was still under contract in Fall 2016, the loss of a full-time HIM professor created a *need* for faculty to teach hours. (*See* Pl. Evid. Ex. 26, Simmons email to Stasher-Booker, 02259). There simply was no need to non-renew faculty in Fall 2016. But even if there were, Hinton remained under contract through December 2016 and could have been retained to fill the need. (Pl. Evid. Ex. 7, Memorandum from Easley, 000004.) Stasher-Booker, a temporary

faculty, could have been non-renewed in July 2016, making her an equally likely candidate for non-renewal. Because both Hinton and Stasher-Booker could have been non-renewed in that term, they were similarly situated.

In sum, ASU's efforts to distinguish Stasher-Booker and Hinton fail. The preliminary facts—job title, duties, pay, and work history—show that Hinton and Stasher-Booker were similar in all material respects.  Perhaps if non-renewing Stasher-Booker would have drug out the instructional load problem for months longer than if she chose Hinton, then we would not be comparing "apples to apples." *Lewis*, 918 F.3d at 1226. But neither was there an instructional load problem in Fall 2016, nor was Hinton more quickly non-renewed than Stasher-Booker. In short, Hinton was the less desirable solution to a non-existent problem. Stasher-Booker is thus a proper comparator to Hinton, establishing the only disputed element of Hinton's *prima facie* case under *McDonnell Douglas*.

**C.  ASU's Reason for terminating Hinton's Employment is pretextual.**

The pretext analysis asks whether "a jury reasonably could infer from the evidence presented that the employer's legitimate justification is pretextual." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1326 (11th Cir. 2011). If so, "the question becomes whether the evidence, considered in the light most favorable to the plaintiff, yields the reasonable inference that the employer engaged in the alleged discrimination. . . . If such an inference is raised by the record, it precludes summary judgment." *Id*.

ASU's stated reason for non-renewing Hinton is "merely a pretext for unlawful discrimination." *Id*. Here, Hinton incorporates her argument stated in the "mosaic" section above as to the grounds (or lack thereof) for non-renewal in July 2016. First, Hinton maintains that she

was teaching a full load in the semester before she was non-renewed (Spring 2016). She also taught a full load in her final semester (Fall 2016). And after she left ASU, three new adjunct faculty were hired to teach HIM courses that otherwise would not have a professor (Spring 2017). In short, Hinton met her instructional load before her non-renewal, she met it during the semester of her non-renewal, and she would have met it in the next semester also. Thus, the claim that Hinton was non-renewed because of lack of instructional load is meritless and pretextual.

Hinton also offered evidence above that ASU's non-renewal decision was based on discriminatory intent. Before Summer 2016, several influential staff in HIM—Stasher-Booker, Tullis, and Dawson—exhibited outright racism to Hinton, including calling her a "white bitch." (Pl. Evid. Ex. 18, Simmons Aff. ¶ 9). These same staff had the ear of Easley as soon as she began working as Dean over the HIM department, influencing her decision of whom to non-renew. Finally, Easley herself dismissed Hinton's claims of discrimination, avoiding a meeting to discuss the claims until as late as possible. This evidence indicates that ASU's stated reason for Hinton's non-renewal is pretextual. Since Hinton has both established a *prima facie* case and proven that ASU's reasoning for its decision was pretextual, summary judgment should not be granted.

### IV. ASU'S DECSION TO END HINTON'S EMPLOYMENT WAS RETALITORY.

To assert a *prima facie* case for retaliation under Title VII, the plaintiff must show "(1) that she engaged in statutorily protected expression; (2) that she suffered an adverse employment action; and (3) that there is some causal relation between the two events." *Cooper v. S. Co.*, 390 F.3d 695, 740 (11th Cir. 2004). ASU does not dispute that Hinton engaged in protected activity (although it misidentifies the activity), nor that she suffered an adverse employment action. (Doc. 44 p. 26.) ASU challenges only the causation element. (*Id.*) "The burden of causation can be met

34

by showing close temporal proximity between the statutorily protected activity and the adverse employment action." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). But it may also be proven by "other evidence tending to show causation." *Id.* In the alternative, ASU also argues that it has a legitimate non-discriminatory reason for non-renewing Hinton. (Doc. 44 p. 26.)

Hinton established causation because she reported racially discriminatory remarks before Easley contemplated Hinton's non-renewal. In Spring 2016, Hinton also reported to Plettenberg Dawson's and others' statements referring to the HIM department as the "white house." (Pl. Evid. Ex 10, Hinton Depo. 73:10-73:21,148:2-7) And before that, Hinton had experienced other verbal harassment from Dawson, which she reported to Plettenberg as well. (Pl. Evid. Ex. *3┃ 11*.) Plettenberg immediately conveyed these complaints directly to Dr. Chesbro, dean of the college. Pl. Evid. Ex 10, Hinton Depo.148:2-149:4) This is important given that Dawson heavily influenced Easley's decision to non-renew Hinton. (Pl. Evid. Ex. 20, Easley Dep., 135:2–7). Recall also that Dawson sat on Easley's interview boards, (Pl. Evid. Ex. 19, Dawson Dep., 58:22–23), Dawson had considerable influence over Easley even from before she was hired. This establishes that Easley likely heard of Hinton's complaints through Dawson in "close proximity" to when Easley was deciding who to non-renew. *Thomas*, 506 F.3d at 1364.

Hinton has also alleged "other evidence" tending to show causation. As discussed above, the instructional load issue was turned on its head during Fall 2016, as Plettenberg's departure left the HIM faculty scrambling to teach the scheduled hours. (*See* Pl. Evid. Ex. 26, Simmons email to Stasher-Booker, 02259). Hinton's contract remained active through December 2016, so she could have been retained for the Spring semester until that time. (Pl. Evid. Ex. 7, Memorandum from

Easley, 000004). Easley's decision to hire new adjuncts rather than retain Hinton can only be described as retaliatory. The record shows that Hinton became more vocal about the racially discriminatory workplace during Fall 2016. She met with Easley to discuss the discrimination, to no avail. (Pl. Evid. Ex. 10, Hinton Dep., 152:3–8). Later, she emailed Easley about the discrimination, to no avail. (Pl. Evid. Ex. 28, Hinton Grievance). At the same time, Stasher-Booker, emboldened as the HIM department's new acting chair, began to disparage Hinton to other faculty. (Pl. Evid. Ex. 29, Simmons Grievance, 02158). Stasher-Booker even called Hinton a "white bitch" to a Simmons, a statement that made Simmons highly uncomfortable but that she felt compelled to share with Hinton. (*Id.*; Pl. Evid. Ex. 10, Hinton Dep., 78–79). Stasher-Booker was acting department chair in Fall 2016, the same time that Hinton could have been retained to teach Plettenberg's courses but was not. This "other evidence" establishes that Hinton's non-renewal was caused by retaliation for her protected activity.

Finally, ASU's argument that Stasher-Booker is not a proper comparator is irrelevant and incorrect. ASU attempts to rebut the view that Stasher-Booker is a proper comparator for discriminatory *firing* in its argument about discriminatory *retaliation*. (Doc.44 pp. 27–30). This is a red herring for two reasons. First, no statement of Title VII law insists upon a comparator for relation claims. *See Lewis*, 918 F.3d at 1220 (stating that the comparator analysis applies to claims "proceeding under *McDonnell Douglas*."). Second, as discussed above in Hinton's argument for discriminatory firing, Stasher-Booker *is* a proper comparator. She could have been non-renewed on the same timeline as Hinton, curing the alleged instructional load problem at the same time. This establishes Hinton' *prima facie* case of retaliation

Further, ASU's proposed nonretaliatory reason for her non-renewal—lack of instructional load—is pretextual. Hinton has debunked the instructional load excuse in her argument section for discriminatory hiring, above. She incorporates that argument here. In sum, there were more than enough instructional hours for Hinton to remain a full-time faculty. Hinton maintains that she taught a full load in Spring 2016. It is undisputed that she taught a full load in Fall 2016, by teaching two courses in Criminal Justice. She also campaigned to keep her job through the Fall semester, including seeking dual appointments with HIM and Criminal Justice, Political Science, or History. And of course, it became apparent in Fall 2016 that there was no instructional load issue in the first place, given Plettenberg's going on leave. This proved to be true. The excess (rather than lack) of hours in Spring 2017 pushed Easley to hire adjuncts to fill the gaps—three of them, all black. As explained above, the instructional load excuse is pretextual.


### V. RACIALLY HOSTILE ENVIONMENT

As discussed above Plaintiff is not making a claim for hostile work environment. Defendant's Motion on these points merely seeks to dismiss Plaintiff's facts regarding the discriminatory and retaliatory conduct she was subjected to during her employment. This is an inappropriate attempt to argue evidence issues which are not appropriate at this juncture. Accordingly, Defendant's Motion with respect to any claims regarding Hostile Work Environment is due to be denied. However, if the Court finds that briefing on these facts or on legal claims not asserted by Plaintiff is necessary, Plaintiff is happy to provide the same.

WHEREFORE, for the above stated reasons, Plaintiff respectfully requests that this Court deny Defendant's Motion for Summary Judgment.


Respectfully submitted,

*s/ Candis A. McGowan*
Candis A. McGowan
Lacey K. Danley

OF COUNSEL:

Wiggins, Childs, Pantazis, Fisher & Goldfarb, LLC
The Kress Building
301 19th Street North
Birmingham, AL 35203
T: (205) 314-0500
F: (205) 254-1500


CHRISTINA D. CROW
Jinks, Crow & Dickson, PC
210 Prairie Street North
PO Box 350
Union Springs, AL 36089-0350

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have served a copy of the foregoing on counsel via United States mail, electronic delivery or E-file using the CM/ECF system on this the 25th day of September 2020.

Kenneth L. Thomas
Ramadanah S. Jones
Office of General Counsel
Alabama State University
P.O. Box 271
Montgomery, Alabama 36101-0271
kthomas@alasu.edu
rsjones@alasu.edu

> *s/Candis A. McGowan*
> OF COUNSEL