IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| AMY HINTON, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) Case No. 2:18-CV-00994-RAH |
| | )       (WO) |
| ALABAMA STATE UNIVERSITY, | ) |
| | ) |
|     Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Amy F. Hinton ("Hinton" or "Plaintiff") filed a two-count complaint alleging that Defendant Alabama State University ("ASU" or "Defendant") discriminated (Count One) and retaliated (Count Two) against her based on her race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

This matter comes before the Court on a motion for summary judgment filed by the Defendant. (Doc. 43.) Upon consideration, the motion is DENIED as to both counts.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). *See also* Fed. R. Civ. P. 56(a). The party asking for summary judgment "always bears the initial responsibility of informing

the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Id.* at 324. Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56 (c)(1)(A), (B).

To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

## **BACKGROUND**

### **A. Hinton's Employment at ASU**

In August 2015, Hinton, a white female, was hired as an adjunct professor[1] at ASU to teach a course in Health Information Management.  (*See* Doc. 47-1; Doc. 47-3 at 2.)

In October of 2015, Hinton applied for a full-time associate professor position in the Health Information Management ("HIM") Department of the College of Health Sciences ("College") at ASU.  (Doc. 47-3 at 3.)  Dr. Steven Chesbro, a white male and dean of the College, and Dr. Cheryl Plettenberg, a white female and Chair of HIM, recommended Hinton for the position. (*See id.*)  As a result, Hinton was hired by ASU as a full-time associate professor in HIM, beginning January 2016. (*See id.*)

In late December of 2015 but before Hinton began her associate professor position, Dean Chesbro resigned from ASU.  (*See* Doc. 47-3 at 3; Doc. 47-10 at 21.) He ultimately was replaced as dean of the College by Cheryl Easley, an African-American female, who began on July 1, 2016.  (*See* Doc. 47-3 at 4-5; Doc. 47-23 at 7.)

When she began as an associate professor in January, HIM was comprised of five employees.  Including Hinton, there were three professors, the department chair (Plettenberg), and the department secretary.  (*See* Doc. 47-21 at 3.)  The other two

---

[1] An adjunct professor generally is a part-time, non-tenure track faculty member who is hired on a contractual basis.

professors, Sabine Simmons and Bridgette Stasher-Booker, were African-American, as was the department secretary, Mae Tullis. (*See id.*)   Brenda Dawson, an African-American female, served as a secretary/administrative assistant to the dean of the College.  (Doc. 42-21 at 3.)  Dawson remained as secretary for Easley upon Dean Chesbro's departure.  (Doc. 47-21 at 5.)  According to former Provost Dr. Leon Wilson, Dawson "ran the place," referring to the College.  (Doc. 47-27 at 16.)

### B. Discriminatory Comments and Treatment

According to Hinton, throughout the duration of her employment at ASU, African-American employees made racially discriminatory comments at her expense and treated her in a discriminatory manner.  (*See* Doc. 47-1 at 7; Doc. 47-21 at 4.)  Tullis and Dawson regularly made discriminatory statements about Hinton, several of which were witnessed by Simmons and Hinton. (Doc. 47-10 at 19.)  According to Simmons, Tullis told Simmons that Hinton was "different from [them]" and that she "didn't belong at ASU."  (*See* Doc. 47-21 at 4.)  Simmons also heard Dawson say that there were "too many white employees" in the College.  (*Id.*)  To Simmons and Hinton, this appeared to be a widely-held belief since they both also regularly heard the College referred to as the "white house." (*Id.*; Doc. 47-10 at 17.)  Simmons also heard the same derogatory sentiment from Stasher-Booker, who would come into Simmons' office and complain about Hinton, stating at one point, "I can't stand that white bitch." (Doc. 47-21 at 4.)

4

In addition to the discriminatory statements of her co-workers within HIM and at the College, Hinton claims she received discriminatory treatment. For example, Dawson refused to give Hinton business cards or to make a digital keycard so that Hinton could access the academic buildings. (*See* Doc. 47-1 at 7; Doc. 47-10 at 23.) Dawson (again, the secretary) would often call Plettenberg to voice complaints about Hinton's work and request that Hinton be fired. (*See* Doc. 47-10 at 19.) Dawson even went so far as to deny Hinton a faculty questionnaire in a staff meeting and told the assembled faculty that Hinton was not a full-time employee. (*See id.* at 24.)

Hinton also claims that Tullis's treatment of her was similarly discriminatory. Among other things, Tullis refused to schedule lodging for Hinton during a faculty retreat, she twice delayed Hinton's paycheck, and she repeatedly scheduled faculty meetings during times when Hinton was teaching. (*See id.* at 27-28.)

During her tenure at ASU, Hinton repeatedly complained to ASU leadership about the discriminatory comments and treatment she received. In 2015, she complained to Plettenberg. (*See id.* at 38-39.) Although Plettenberg said she would pass the comments along to Dean Chesbro, nothing came of it. (*See id*.) Plettenberg also told Hinton that Dawson hated her because she was white, that she treats all white faculty horribly, and that Dawson was going to get her fired. (Doc. 47-19 at 18, 19.) Hinton then approached Dean Chesbro and complained of Dawson's

discriminatory behavior, to which Chesbro promised to speak with Dawson.  (*See id*.)

After becoming a full-time professor in January 2016, Hinton continued to complain to Plettenberg.  (*See id.)*  In the Fall of 2016, Hinton time and again attempted to speak with Easley, the new acting Chair of HIM, but was repeatedly denied a meeting.  (*See id.* at 22; Doc. 47-10 at 22).  Eventually, when Hinton was successful in meeting with Easley, nothing was done.  (*See* Doc. 47-10 at 40.)

After failing to achieve a resolution with both the Chair of HIM and the Dean of the College, Hinton escalated the issue by attempting to meet with Provost Wilson, but his secretary would never schedule a meeting. (*See id*.)

### C. The Fall 2016 Semester

A little over a month after beginning her employment at ASU on August 1, 2016, Easley issued a memorandum to Provost Wilson recommending that Hinton not be reappointed for the Spring 2017 semester at HIM because the "number of faculty in that department exceeds that required by the instructional load available for assignment." (*See* Doc. 47-7.)   In other words, according to ASU, HIM (and therefore ASU) no longer needed Hinton because HIM did not have enough courses for Hinton to teach a full course load (twelve hours/four classes) as required by the ASU Faculty Handbook; a handbook Easley never read. (*See* Doc. 45-9 at 67; Doc. 47-23 at 36.)

However, according to Simmons (one of the other professors in HIM at the time), there were enough courses for Hinton to teach a full load in HIM at the time Easley claimed there were not.  (*See* Doc. 47-21 at 4.)

On August 3, 2016, Plettenberg notified Hinton that for the Fall semester Hinton would be teaching two classes in HIM and two in criminal justice at the College of Liberal Arts & Sciences (A&S) because A&S was short-staffed.  (*See* Doc. 47-3 at 3.)

Approximately two weeks later, on August 15, 2016, Plettenberg called Hinton to tell her that Hinton's contract was not being renewed at the end of the Fall semester.  (*See* Doc. 47-1 at 7; Doc. 47-3 at 3-4.)  Plettenberg also said that she was not involved in the decision and that since "Dr. Chesbro is gone, now you are gone, and they will be coming for me next."  (*See* Doc. 47-3 at 4.)

Shortly after this conversation, Plettenberg was placed on leave in September of 2016.  (*See id*.) Easley then appointed Stasher-Booker as the interim chair of HIM. (*See id.*)

Although Hinton never received a letter[2] in the mail informing her of her nonrenewal, she was called to Easley's office on September 26, 2016 and given a letter from Provost Wilson informing her that her contract would end on December

---

[2] The envelope containing the letter indicated that although it had been sent on August 8, it was returned as undeliverable on August 9.  (*See* Doc. 47-9.)

15, 2016.  (*See* Doc. 47-1 at 3, 7.) Hinton then finished out the semester, ending on December 31, 2016.

Although ASU's stated reason for not reappointing Hinton for the Spring 2017 semester was a lack of courses for her to teach, ASU hired three new individuals, all of whom were African-American, as adjunct professors to teach fourteen course hours (4 classes) in HIM for that Spring semester.  (*See* Doc. 47-13; Doc. 47-14; Doc. 47-15.)  A year later, ASU hired another African-American individual as an assistant professor in HIM, beginning February 2018. (Doc. 47-16 at 2; Doc. 47-17 at 2; Doc. 47-29 at 36.)

On February 9, 2017, Hinton filed a Charge of Discrimination at the Birmingham office of the EEOC.  (*See* Doc. 47-1 at 5.)

## DISCUSSION

The Complaint advances two claims.[3]  First, Hinton alleges that ASU discriminated against her based on her race in violation of Title VII by not renewing her contract or reappointing her. (*See* Doc. 1 at 8.)  Second, Hinton claims that ASU retaliated against her after she complained about discrimination based on her race in violation of Title VII.  (*See* Doc. 1 at 11.)  As to both claims, Hinton focuses on

---

[3] In its summary judgment motion, ASU argues that it is entitled to summary judgment on Hinton's claim for a hostile work environment.  In response, Hinton states that she is not advancing any such claim.  Since Hinton is not advancing such a claim and since her Complaint appears not to assert one either, the Court pretermits any further discussion of such a claim.

discriminatory comments made about her, coworkers' statements about the racial composition of HIM, the replacement of white supervisors with unsympathetic African-American individuals, and ASU's successive hiring of African-American adjunct professors to fill the teaching demands within HIM, the nonexistence of which had been the rationale for Hinton's nonrenewal.

ASU responds that it is entitled to summary judgment on both claims.  It does not dispute that the comments were made, but instead claims that the discriminatory remarks had no bearing on Hinton's removal because they were not temporally proximate to her nonrenewal.   ASU also responds that it had a legitimate nondiscriminatory reason for not reappointing Hinton; that is, insufficient available course hours for Hinton to teach.   (*See* Doc. 44 at 21.)   Finally, ASU responds that Hinton's lawsuit centers upon a claim of a hostile work environment which she did not plead in her complaint nor properly grieve with the EEOC.

After reviewing the parties' briefs and evidentiary submissions, the Court concludes there are bona fide questions of material fact on both claims and therefore that ASU's summary judgment motion should be denied.

1.  Hinton exhausted her administrative remedies.

    a.  Hinton's EEOC charge was timely.

ASU's first attack is a technical one in that, according to ASU, Hinton failed to timely file her charge of discrimination with the EEOC and therefore her two

9

claims must be dismissed for failure to exhaust her administrative remedies.  In particular, ASU contends that because "Hinton knew about her non-reappointment on or before August 4, 2016," and the operative statute only grants 180 days to file a charge, she should have filed her charge no later than January 31, 2017.  Thus, her filing on February 9, 2017 was untimely.  (Doc. 44 at 10.)

ASU is correct that Hinton was required to file her EEOC charge within 180 days of being notified of her nonrenewal.  *See Ledbetter v. Goodyear Tire & Rubber Co.*, 421 F.3d 1160, 1178 (11th Cir. 2005).  Hinton, however, disputes the date of notification, testifying that she was orally informed of her nonrenewal during a phone call with Dr. Plettenberg on August 15, 2016.  (*See* Doc. 47-3 at 3.)  Her EEOC charge stated she was informed on September 26, 2016, the date on which Hinton was given Provost Wilson's letter dated August 4, 2016.  (*See* Doc. 47-32 at 1.)  If August 15, 2016 is the operative trigger date, then the EEOC charge was timely filed on February 9, 2017 as it was only 178 days afterward.

ASU argues that Hinton testified she had learned of the nonrenewal before August 15, 2016 and even before August 4, 2016.  (*See* Doc. 51 at 3.)  However, Hinton argues that this is a mischaracterization by ASU of her deposition testimony about a conversation Hinton had with Plettenburg concerning two courses she was to teach that fall.  (*See* Doc. 48 at 14.)

The Court has read the deposition testimony that ASU cites to prove Hinton was aware of her nonrenewal as of August 4, 2016. The Court, however, cannot conclude, as does ASU, that this testimony substantiates Hinton's earlier awareness, and certainly not to a degree entitling ASU to summary judgment.   At the least, the line of questions and answers are vague and confusing.  But in any event, especially in light of the affidavit testimony submitted by Hinton, the record reflects that there is a genuine dispute of material fact precluding ASU from obtaining summary judgment on the factual issue of the first date of Hinton's knowledge.  *See Wood v. Schultz*, No. 2:11-cv-670-CSC, 2013 WL 160272, at *1 (M.D. Ala. Jan. 15, 2013) (holding that a movant only meets his burden if he demonstrates the absence of a genuine dispute of material fact.)  Accordingly, ASU is not entitled to summary judgment to the extent it alleges Hinton failed to timely exhaust her administrative remedies.

### b.   Hinton's retaliation claim grew out of the conduct she articulated.

ASU also argues that Hinton failed to exhaust her administrative remedies with regard to her retaliation claim (Count Two) because she failed to check the retaliation box on her EEOC charge.  (*See* Doc 44 at 14.)  Under Eleventh Circuit precedent, however, this is not disabling to Hinton's case.

In *Batson v. Salvation Army*, 897 F.3d 1320 (11th Cir. 2018), the Eleventh Circuit found that, although a plaintiff does not check the retaliation box on her

EEOC filing, the exhaustion requirement can still be met when the EEOC's investigation would have "reasonably uncovered any evidence of retaliation." *Id*. at 1327. *See also Gregory v. Ga. Dept. of Human Res*., 355 F.3d 1277, 1279 (11th Cir. 2004) (holding that although the plaintiff had not checked the retaliation box on the document she filed with the EEOC, "the exhaustion requirement was nonetheless satisfied" because the EEOC's "investigation ... would have reasonably uncovered any evidence of retaliation."). Thus, the determination as to whether Hinton has exhausted her remedies comes down to whether the retaliation claim could reasonably be expected to grow out of the charge of discrimination that Hinton submitted.

Reviewing Hinton's EEOC charge, it is clear that her retaliation claim would be reasonably expected to grow out of the charge of discrimination that she filed. In fact, she specifically referenced it in her EEOC filings. As Hinton wrote, "I was non-renewed because I am white; specifically, *in retaliation* for my complaints to the Dean about my African-American coworkers…." (Doc. 47-2 at 2 (emphasis added).) This statement alone shows that not only did her claim of retaliation grow out of the allegations contained in her charge, but that it could reasonably be expected that the scope of the EEOC investigation would, and did, include it. Therefore, Hinton did not fail to exhaust her administrative remedies in regard to her retaliation claim. *See Little v. CSRA*, No. 1:19-cv-00147-ECM-SRW, 2019 WL

7559788, at *6 (M.D. Ala. Oct. 8, 2019), report and recommendation adopted sub nom. *Little v. Gen. Dynamics Info. Tech.*, 2019 WL 5847225 (M.D. Ala. Nov. 7, 2019) (holding that administrative remedies are considered exhausted for claims that amplify or clarify the allegations in the EEOC complaint), *aff'd, Little v. CSRA, Inc*., 2020 WL 6372984 (11th Cir. Oct. 30, 2020).

2. <u>There are genuine disputes of material fact as to whether Hinton was discriminated against.</u>

In order to establish a prima facie case for Title VII discrimination under these facts, Hinton need only establish that she was (1) a member of a protected class, (2) qualified for the job, (3) the victim of an adverse employment action, and (4) replaced by someone outside her protected class. *Hinson v. Clinch Cnty., Ga. Bd. of Educ.*, 231 F.3d 821, 828 (11th Cir. 2000).

Because the employment action is a nonrenewal/nonreappointment based on a purportedly innocuous justification (insufficient course hours to teach) instead of a disciplinary reason, the fourth element is simplified. Instead of finding a similarly situated comparator with a similar disciplinary history, Hinton need only show that her work was taken over by someone outside her protected class. *See Cuddeback v. Fla. Bd. of Educ.*, 381 F.3d 1230, 1235 (11th Cir. 2004). Once this is established, the *McDonnell Douglas* burden-shifting framework requires that ASU proffer an innocuous, that is, legitimate, nondiscriminatory, reason for Hinton's nonrenewal. Then the burden shifts back to Hinton to show that this justification is pretextual.

An alternate method of surviving summary judgment is the articulation of a convincing mosaic of disparate discriminatory incidents. *See Smith v. Lockheed-Martin Corp.,* 644 F.3d 1321, 1328 (11th Cir. 2011).

> a. <u>There is a genuine dispute of material fact as to whether ASU's excuse is pretextual.</u>

ASU argues that there are no legitimate comparators for Hinton, and therefore her case falters as a matter of law.  (*See* Doc. 44 at 19.)  However, ASU misapplies the comparator analysis because Hinton need not show anyone similarly situated to her.  Rather, Hinton need only show that she was replaced in her duties by someone from a different race. *See Martin v. Lawson State Cmty. Coll.*, No. 2:15-cv-01851-KOB, 2018 WL 3609018, at *2 (N.D. Ala. July 27, 2018) (holding that, in the context of a firing, the fourth element of the *McDonnell Douglas* test can be met by showing either that the plaintiff was replaced by someone of a different race or that a similarly situated individual was treated differently).

Hinton has succeeded in showing a prima facie case of racial discrimination. The facts show that she is white, that she was qualified for the position, and that she was nonrenewed.  As to these first three elements, ASU does not raise a challenge.

The facts, in the light most favorable to Hinton, also show that HIM course hours, including several classes that Hinton taught, were covered by three newly hired African-American adjunct professors.  (*Cf.* Doc. 47-10 at 10 (Hinton's testimony she taught HIM 210) and 47-13 at 2 (hiring Sonya Braddy to teach HIM

210).) In other words, Hinton's course load was not absorbed by the existing staff members within HIM. Instead, when Hinton was let go, ASU immediately brought three new African-American adjunct professors on board, all of whom taught courses in HIM. And the evidence shows that for the following year, ASU hired yet another individual as an assistant professor, and this new individual also was African-American. Further, as Hinton generally notes, during the pertinent window of time in this case, a white professor was hired by a white department chair to be part of a college overseen by a white dean, and within two years, all of these employees separated from ASU and were replaced by African-American individuals. The totality of this evidence is sufficient for Hinton to have met the fourth element of her prima facie case at this stage.

The burden then shifts to ASU to show a non-discriminatory justification. ASU argues that there were not enough course hours for Hinton to teach in HIM during the Fall semester of 2016 and therefore ASU policy required her nonrenewal for the following semester and thereafter. (*See* Doc. 45-14 at 1). To support this, ASU has submitted a class schedule for the Fall semester of 2016 showing that Hinton was listed to teach only two courses in HIM. (*See* Doc. 47-38 at 3-4.)

The burden then shifts back to Hinton to show that this justification is pretextual. Hinton argues that Easley has testified that the submitted schedule does not look official or final. (*See* Doc. 47-23 at 37-38.) Further, a review of the

scheduling document shows, for the Spring semester of 2017, there were ten courses offered in HIM and only one professor to teach them.  (*See* Doc. 47-38 at 4.) Moreover, Simmons (Hinton's fellow professor in HIM) has also testified that there were enough courses for Hinton to teach at the time she was non-renewed.  (Doc. 47-21 at 4.)

ASU further argues that the 2017 Spring semester calendar is not evidence of pretext because of a dramatic change in staffing circumstances between August 2016 when ASU predicated Hinton's future nonrenewal on a course load shortage, and the 2017 Spring semester when ASU hired three African-American individuals to teach surplus courses; namely, that both Plettenberg and Simmons left and had not come back.  (*See* Doc. 51 at 12.)  Hinton responds that there were enough courses for her to teach in HIM at the time of nonrenewal.  And even had there not been, Hinton argues, Dr. Plettenberg went on leave well in advance of December 31, 2016, the date Hinton's employment was due to terminate, and therefore ASU easily could have retained Hinton instead of reallocating the classes to Stasher-Booker, who already had a full load.  All of this, according to Hinton, strongly weighs in favor of a finding that her nonrenewal was racially motivated.  (*See* Doc 48 at 23-25.)

ASU also argues that Easley was the new chair, beginning July 1, 2016, and there is no evidence that she made the decision to nonreappoint for discriminatory reasons.  Therefore, according to ASU, Hinton has not established a causal

connection between the discriminatory statements of employees like Dawson and Tullis and the nondiscriminatory actions of Easley, the decisionmaker.  (*See* Doc. 51 at 5.)   Hinton responds that while Easley is not alleged to have made racially disparaging remarks, her indifference to Hinton's pleas for help as well as her complete reliance on the advice of those who did make those statements is enough for Easley's final decision to be infected by racially discriminatory intent.  Hinton's arguments are availing under a cat's paw liability theory:

> Under a cat's paw theory of liability, 'causation may be established if the plaintiff shows that the decisionmaker followed [a] biased recommendation without independently investigating the complaint against the employee.  In such a case, the recommender is using the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus.

*Lawson v. KFH Indus., Inc.*, 767 F. Supp. 2d 1233, 1245 (M.D. Ala. 2011) (granting summary judgment because (1) there was no evidence that the decisionmaker relied on the statements of those alleged to have made racist statements and (2) there was evidence that the decisionmaker witnessed the incident that caused the termination).

Here, Easley's own testimony establishes both that she relied extensively, if not exclusively, on the advice of Dawson, who made many discriminatory statements, and also that she did not thoroughly review the class assignments, which were the stated basis for Hinton's nonrenewal.  That Easley may not have harbored racial animus does not foreclose Hinton's race discrimination claim. Indeed "in the typical cat's paw analysis, it is agreed that the decisionmaker did not harbor any

racial animus." *Williams v. Alabama Dep't of Transp.*, 509 F. Supp. 2d 1046, 1061 (M.D. Ala. 2007). Rather, it is Easley's blind reliance on Dawson, around whom factual questions of racial animus and motive continue to circle, that defeats summary judgment.

Simply put, Hinton has provided sufficient evidence showing a question of fact as to whether ASU's stated reason for Hinton's nonrenewal is pretextual.

### b. Hinton has shown a convincing mosaic of discriminatory behavior.

Hinton also claims that she has met her burden under the convincing mosaic theory of discrimination.

Establishing the elements of the *McDonnell Douglas* framework "is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Lockheed-Martin Corp.* 644 F.3d at 1328. Rather, the plaintiff will survive summary judgment if she presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent. *Id.* A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a "convincing mosaic" of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.*

Evidence showing such a mosaic may include "(1) suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees; and (3) that the employer's justification is pretextual." *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019). "Whatever form it takes, if the circumstantial evidence is sufficient to raise 'a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper.'" *Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1256 (11th Cir. 2012) (quoting *Lockheed-Martin Corp.*, 644 F.3d at 1328).

Here, Hinton has presented sufficient evidence of such a mosaic. She has shown that she was one of three white employees in HIM (counting Chesbro, Plettenberg and Hinton) who departed within two years, all of whom were replaced by African-Americans. This came in the context of other members within and outside of HIM calling it the "white house," saying there were "too many white employees," and saying that Hinton "was different from us," "didn't belong," and was a "white bitch." (Doc. 47-21.) Important is the deposition testimony of Easley, the person who purportedly recommended that Hinton be nonrenewed. According to Easley, when she decided to nonrenew Hinton, she relied on Dawson, a person who made undisputedly racist and discriminatory comments about Hinton and the number of white employees within HIM. (Doc. 47-23 at 36.)

Other evidence shows that, although ASU's stated reason for Hinton's nonrenewal was lack of courses, HIM was short-staffed during Hinton's final semester at ASU and three African-American individuals were hired immediately following her departure to cover courses within HIM, including at least one of Hinton's classes.   Indeed, the record shows that Plettenberg was put on administrative leave in the Fall of 2016, thereby creating such a strain on HIM that Simmons emailed Stasher-Booker complaining of being short-staffed and overstretched for having to teach extra courses after Hinton's looming departure. (*See* Doc. 47-31 at 2.)

Hinton also points to the difficulty accompanying administrative tasks that involved her.  For example, Dawson refused to order business cards for Hinton or to provide her with a security card for the campus.  Tullis failed to book only Hinton's lodging for a faculty retreat and delayed payments to Hinton.

Furthermore, evidence has been presented that at least one African-American employee (Simmons) defended Hinton, after which time she too was treated in a discriminatory manner.  Simmons submitted an affidavit claiming that, when she refused to participate in the adverse treatment of Hinton, the bad actors in HIM began to retaliate against her and treat her differently as well.  (*See* Doc. 47-21 at 4.)

When taken together, Hinton has provided sufficient evidence of a convincing mosaic of discrimination within the workplace for her claim to proceed.

3. <u>There is a genuine dispute of material fact as to whether Hinton was retaliated against for complaining of the discriminatory treatment she received.</u>

In its motion, ASU also argues that it is entitled to summary judgment on Hinton's claim for retaliation (Count Two).  Upon review of the record, this is not the case.

To assert a *prima facie* case for retaliation under Title VII, the plaintiff must show "(1) that she engaged in statutorily protected expression; (2) that she suffered an adverse employment action; and (3) that there is some causal relation between the two events." *Cooper v. S. Co.*, 390 F.3d 695, 740 (11th Cir. 2004).

Here, it is clear that Hinton engaged in protected activity each time she complained to a superior (Plettenberg, Chesbro, Easley and Wilson) that she was being discriminated against. (*See* Doc. 47-10 at 22, 38-39; Doc. 47-19 at 18-19.) It is likewise clear that Hinton's nonrenewal was an adverse employment action.  *See Thomas v. STERIS Corp.*, No. 2:16-cv-996-ALB, 2019 WL 4253847, at *4 (M.D. Ala. Sept. 6, 2019), *aff'd*, 819 F.App'x 741 (11th Cir. 2020) (holding that "[t]ermination is obviously an action that constitutes an adverse employment action.").  ASU challenges the causal link between the two.

Hinton can show causation either by demonstrating temporal proximity between the protected activity and the adverse employment action or by showing other evidence tending to show causation.  *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).  In order to demonstrate temporal proximity

between the protected expression and the adverse action, Hinton must show that the gap between the two was close, usually within a month or so. *Id.*

On the facts as Hinton presents them, there is no clear temporal proximity between her complaints and her nonrenewal. The record reflects two specific instances of complaints that took place before the decision not to renew Hinton. She complained in the Fall of 2015, (*see* Doc. 45-4 at 98), and again in the Spring of 2016, (*see* Doc. 45 at 3). While specific dates have not been given, Hinton has not pointed to any specific complaints in the months immediately preceding August 2016, a necessity for temporally proximity purposes. Accordingly, Hinton's retaliation claim cannot proceed based simply on the issue of temporal proximity.

But, there is other evidence tending to show causation. This other evidence can take a wide variety of forms and can overcome a temporal deficiency by forming a causal chain of retaliatory activity between the first complaint and the retaliatory action. Hinton complained at least once in late 2015, and according to her, continuously complained thereafter. It was shortly after the initial complaint, according to her testimony, that the discrimination against her intensified. (*See* Doc. 45-4 at 98.) The chronological chain of discriminatory behavior toward Hinton links her first complaint to the decision to nonrenew. *See Hutchinson v. Auburn Univ.*, 2020 WL 1905968, at *5 (M.D. Ala. Apr. 17, 2020) ("Plaintiff has alleged other facts that could be considered circumstantial evidence of causation, such as disparate

treatment, mandated busy work, limited overtime, and a potential surveillance device that she found in her office."); *Boyland v. Corr. Corp. of Am.*, 390 F.App'x 973, 974–75 (11th Cir. 2010) (holding that "[i]n the absence of close temporal proximity between the protected activity and the employer's adverse action, a plaintiff may be able to establish causation where intervening retaliatory acts commenced shortly after the plaintiff engaged in a protected activity"); *Woldeab v. DeKalb Cty. Sch. Dist.*, No. 1:16-cv-1030-CAP-JKL, 2018 WL 10510815, at *7 (N.D. Ga. Nov. 6, 2018) (holding that "there are instances in which a consistent and sustained pattern of retaliation, which begins immediately after protected activity, will create an inference of causation between the protected activity and the entirety of the retaliatory actions"); *Richie v. Mitchell*, No. 5:14-cv-2329-CLS, 2015 WL 3616076, at *6 (N.D. Ala. June 9, 2015) (denying motion to dismiss because, although the temporal proximity may be too tenuous to state a retaliation claim, "some other facts alleged by plaintiff ... could also be considered as other evidence of retaliation").  This is especially true given the evidence of racially charged comments and statements by other individuals within HIM, the observations of another African American coworker within HIM, and the apparent elimination/departure and replacement of the only three white employees within HIM with African American individuals.

Hinton catalogued a series of discriminatory comments and actions by her coworkers that took place during her short tenure at ASU.  The Court need not detail these comments and actions once again.  However, all told, these comments and actions form a sufficient causal chain bridging the gap between her complaints of discrimination and the decision not to renew her employment.  Accordingly, the Court finds that there is sufficient evidence of retaliation under the facts of this case to preclude summary judgment.

## **CONCLUSION**

For the foregoing reasons, the Court **ORDERS** that the summary judgment motion (Doc. 43) filed by Defendant Alabama State University be and is hereby **DENIED** as to both counts.

**DONE** and **ORDERED** this 25th day of November, 2020.


_____/s/ R. Austin Huffaker , Jr.____
R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE